Okay, let's get started with our third case, 21-1151 Core Progression Franchise v. O'Hare. Mr. Moretta for the appellant. Good morning, your honors. David Moretta on behalf of defendant appellants Chris O'Hare and CEO Enterprises Inc. Your honors, in light of this court's well established standards, the disfavored preliminary injunction, which the lower court explained in this case was required to prevent extraordinarily damaging remarks and to preserve any remaining customer goodwill customer had in the North Carolina market, simply cannot be allowed to stand. Conspicuously absent from the court's order are the required key findings from this circuit's irreparable harm framework, including any finding that the plaintiff had made a clear and unequivocal showing that it likely will suffer irreparable harm, not compensable with money damages, or any facts establishing an imminent, certain, actual, and non-speculative risk of future irreparable harm. Under the established precedent of this circuit set forth in cases such as DTC Energy, Schreyer, Hydeman, and New Mexico Department of Game and Fish, in order to warrant this extraordinary remedy of injunctive relief, the alleged harm must also be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm. And if this harm is not likely to occur before the district court rules on the merits, there is no need for preliminary injunctive relief. It's important for the court to keep in mind that in this case, the district court essentially was presented with only a single day snapshot from among the entire 56 day period that followed the January 29th, 2021 franchise termination. That single day was February 25th, 2021, on which the plaintiff presented a number of internet screenshots, but presented no testimonies to any other day during that 56 day period. Other than the fact that the defendants were operating a new fitness studio in their former franchise location in Apex, North Carolina, the only events cited by the district court occurring during these 56 days following the termination were an alleged attempt by the defendant to access plaintiff's client list on February 16th, 2021, a fact which actually cuts against the notion that defendants were using any kind of client list in their possession. Counsel, your point just now about facts cutting against, we're not reweighing facts, right? We're deferring that we're on an abusive discretion standard of review. And it seems to me that your argument invites us to do the very thing we're not supposed to be doing. Respectfully, I'm not asking you to do that. I'm simply pointing out the reason that there's no actual finding of ongoing irreparable harm by this district court in the context that the only facts that the court cited in terms of any events that occurred during this 56 day period were that alleged attempt about the client list and what we're calling the Omid review and all the other internet screenshots from February 25th of 2021. Can't rep reputational injuries and kind of taint a franchise's entry into a new geographical market? Aren't there cases that permit that to be the basis for irreparable harm? And isn't that what the court in this case found? Respectfully, Your Honor, the Omid review you're referring to was the single instance where there was this damaging remark that the court placed heavy reliance upon. What the district court overlooked was the fact that, first of all, this review was in the context of a post that, in fact, was made by court progression's principle. In this case, it was not a consumer, notwithstanding the representations of Mr. Cerf and his counsel to the district court that this was actually a consumer. This was court progression pointing out that there seemed to be some similarities between the two businesses. Mr. O'Hare responded to that. The post was up for less than 24 hours before it was removed and it was taken down more than a month before the injunction hearing. Didn't Altru hold itself out as the successor to court progression and reveal that to its potential market? That was also what was taken down, Your Honor. Again, this is a single snapshot of one day in February, more than a month before the hearing. At the time of the hearing at the end of March 2021, there was no evidence before the court that showed there were any kind of those remarks going on. There was no evidence that showed that any consumer actually saw that remark, that any consumer actually was confused about the existence of these two companies. And the fact that they would list themselves as formerly court progression certainly shows that there's a difference between those. They're not claiming any difference. What about the idea that by you being allowed to ignore the covenant not to compete and to continue using the court progression name, at least for some period of time, if that's not enjoined, that it basically encourages other franchisees to violate the agreement thinking that they'll have no consequences? That wasn't an argument that the district court considered. You say it was not an argument? Was not, no. Was it presented to the district court and he just didn't consider it? Correct. Okay. Correct. And the fact is there's a presumption among five different presumptions that district court applied in this case. One of which is that injunctive relief is warranted where there's a franchise, a former franchise in a former franchise location that's continuing to operate. That in fact, that presumption was rejected by both the post-net and stake and shake courts. The post-net judge, as the court is aware, was the same judge that issued the fitness together decision upon which the district court in this case relied heavily. The fact is that where cases such as post-net have looked carefully at the facts of the case, it's not just simply the fact that there was a former franchise business that necessarily leads to any kind of harm or the fact that a non-compete is not a force leads to that harm. Post-net actually pointed out that this is the kind of damage that the franchise or can seek, quantify and monetarily and recover that way. Okay. Let me stop you for a minute because we've drifted away from what my question was. Do you, and let me rephrase it so it's maybe more clear. Do you agree that one type of injury that could, core progression could suffer in this case is that if an injunction wasn't granted, stopping you from doing certain things or your client, that other franchisees might then also breach their agreement thinking there were no teeth to it? It's a common argument that's advanced in franchise cases, Your Honor. The fact is, in this case, there was no evidence of it. Well, I mean, what, what, I mean, how, it had just happened. How could there be evidence? I mean, how could they already say, oh, well, they, they noticed within the past 30 to 60 days that they were using our name and still operating. And I mean, they hadn't even had a hearing yet. So, I mean, I guess, I guess it's, it's a looking forward claim from the, when you're at the hearing before the district court. And, and the question is, is not whether it's common, because I'm sure it is common, but whether it has any merit. I mean, is that a type of injury on which a court can rely? Yes, if there's testimony to support it, which was the case in Fitness Together. And the difference is that the district court in this case simply cited the principle that the franchisor suffers harm every day that the franchisees are allowed to flout the non-compete provision. Well, that was a conclusion that the Fitness Together court drew after receiving testimony from the CEO concerning the highly competitive fitness and nutrition industry, noting that it's very difficult to win back customers, things of that nature. There was specific testimony that showed that injury. It seems like it's a presumed type of injury, because, I mean, how would you, how would you, how would you have them prove it? I mean, it has to, I mean, because on the day that happened, on the day that they're talking to the district court about it, it's obviously can't have happened yet, because they're just then getting their chance to get an injunction. So obviously nobody's flouted, no other franchisees are flouting the non-compete and other provisions of their franchise agreement, because there hasn't even been a chance for an injunction yet. I mean, so is that kind, I guess my question is, is can courts presume that type of injury? The, my other franchisees are going to try to protect it so they won't. I think that presumption of that injury cuts directly against the guidance from the Supreme Court in winter, as well as Dominion Video, Equistar, and this circuit. The fact is, when you look at a case such as PostNet, where the district court actually reviewed all of these arguments, considered the franchisor's argument in the light of testimony that there would be that kind of an injury, and rejected it, in part because the district court found in PostNet that that kind of injury is compensable with money damages, and there certainly free to re-franchise in the area, there was no testimony showing that they couldn't do that in that case. None of that kind of evidence was before the district court in this case, so it was a presumption. So are there any presumptions that operate in this context? No, Your Honor. I think that the five presumptions that the district court referenced, that an injunctive relief is warranted whenever there's a franchise in a former location, that being excluded from rights inherent in one property amounts to irreparable harm, there's harm to trade secret owner whenever a defendant possesses trade secrets in a position to use them. These are the principles from Fitness Together and Port-a-Port that were expressly rejected, and not only rejected by the principles in this circuit, but this particular district court itself actually noted in a previous opinion that Port-a-Port, in fact, was relying on a presumption that had been rejected by the Tenth Circuit. In that case, it's Titan Manufacturing Solutions, 2019 Westlaw 526-5271. The fact is, if you look at the two pages of irreparable harm analysis offered by this judge for this disfavored type of extraordinary relief, and you strip away the presumptions, and you strip away the argument of counsel that was twice cited in the argument as evidence there, you basically wind up with two pieces of evidence. One is the 15-second response provided by plaintiff's principal as the final answer of his direct examination, which was the only testimony provided of any kind regarding alleged harm to district court, and the second is the dubious and previously deleted Omid review, which we've just mentioned here. That's it. The fact is, none of these, if you compare the other franchise cases in particular, such as post-sentence staking check, it makes it clear that there is, it is a fact-specific inquiry, that it is possible, particularly where there's no other franchise location in the area, for there to be no irreparable harm on the lawyer, any harm that might be incurred can be compensated by money damages. If the court looks at cases even where injunctions were granted in other cases, such as Fitness Together, Maids International, and a new case by the District of Colorado, Bar Method Franchise Order 22 Westlaw 174307, these are instances where the former franchisee, in fact, was actively using the franchisee's proprietary information. They had signage outside that was confusing customers. They were marketing specifically to former customers using the franchise or its trademarks and emails. What about the fact that court progression was relying on your client to satisfy their market presence? That's the case in every instance where a franchise relationship is terminated in a remote area, such as this one, which was 1300 miles away from the nearest court progression location. Is that a presumption? It is, again, another presumption. And so it's a presumption that operates without independent proof at the hearing. I'm trying to understand how far we can take these presumptions because they are the principles that we're extracting from the applicable jurisprudence on this. But then as applied, it seems that you're saying they actually don't do any work for court progression here. They don't. And I think if the court reviews the stake and shake analysis, Judge Moore, in that case, gave a very detailed and thoughtful analysis of the fact that when you had two branded stake and shake locations in the Denver area, the nearest stake and shake location being 80 miles away in Colorado Springs, that there was no irreparable harm to stake and shake for the balance of the non-compete period for those restaurants that being allowed to continue open so long as they weren't using stake and shakes marks. I'm going to reserve the rest of my time, please. All right. Thank you, counsel. Let's hear from the court. Good morning, Judge Timkovich, Judge Rossman, and Judge Carson. My name is Jim Mulcahy, and I represent the Appalee Court Progression. I want to start by following up on something that you, Judge Carson, raised a moment ago relating to the impact on other franchisees when this type of thing is allowed to go on. The sentiment was expressed, your sentiment was expressed by the badass coffee case when the court said, covenants not to compete protect a franchising company's goodwill. Defendants' actions in opening the competing coffee shop are likely to send negative messages about the franchisor to the market and to other franchisees. Tell me how you pressed this issue before the district court. I'm sorry, your honor? Tell me how you pressed this issue before the district court. Well, Mr. Cerf testified about the fact that given what had transpired and the use of the court progression name to try to leverage into a competing business while still a franchisee of court progression, it gave the message to everyone, including other franchisees in the court progression system, that this was a failed endeavor and that court progression had opened up a shop and in less than four months failed. And so I don't think... Okay, so you have to draw an inference from that though to suggest that other franchisees would view the failure to get an injunction as weakness in the suggestion that they could just breach and do what they wanted with your marks and your customer lists and all of that. The underlying rationale for seeking the injunction was to protect the goodwill of the system that is available to everyone and to make it very clear that this type of conduct is not going to go unanswered because of the harm that it creates. So that kind of harm though is not irreparable in the sense that it can be... That same message can be sent through a vigorous litigation, through trial, a large money damage verdict. That type of thing could also send that type of message, couldn't it? Not under the facts that are out in August of 2020. And by December of that year began downloading all of the customer information and all of the proprietary parts of the system. And when he then started to contact the customers and tell them that All True Fitness, which was referred to as formerly Core Progression, was now making changes and all of these customers should now be converted to All True Fitness... Were those customers in fact converted? Well, that was... The answer is we don't know because that was very difficult. That would be come to learn based on the timing where we're in an injunction. What was clear is that... That could be ultimately proven, couldn't it? Through discovery in a trial? And you could be potentially compensated by damages? Well, the harm to the franchisor's goodwill could not be compensated by damages and it is not going to be something that one can identify. And the whole point behind the injunction was to stop it from causing that kind of harm. But the answer is no, we would never be able in the course of a trial to determine who was converted and who wasn't. But Mr. O'Hare made it clear. I asked him, you're in the process of rebranding. This is December, January of 2020, January 2021. You're in the process of rebranding to All True Fitness as quickly as possible. You're responding to them, meaning the customers who are consumers that are calling him to find out what's going on. You're responding to them as if you were core progression, right? Making the change. Answer, I suppose so, yes. And your response to the public, the confused public in this timeframe, was to say, quote, the other company turned out to be a fake franchise, right? And his answer was, yes, sir. That is unbelievable harm that you don't find in the context of wanting to simply open up an unbranded business after the contract expires. This is a hijacking of all of the proprietary software business records. They were even wearing the clothes of core progression in December of 2020, which was less than four months after they opened up. And Judge, the trial court below, made it very clear that the evidence that it found, the facts that it established, was that they were misappropriating the trade secrets, including the sensitive and valuable customer data, rebranding the franchise as All True Fitness, among other actions, and essentially was hijacking the entire system while it was a franchisee. That's the kind of thing... So if that's... Let me ask you this, and I may not even be looking at it the right way. I'll stand corrected if you correct me. But if that's... Say they were hijacking your entire system for implementation in one location in North Carolina. How did that affect the rest of your system? How did that affect... How did that create irreparable harm for core progression as a whole? It would create the very concern that you expressed. All of the other franchisees will believe that they can hijack the system, de-brand, stop paying royalties, and open up a competing business with the software and other trademark or trade secrets of the franchisor. It sends a message to them. Did you have any evidence that any of the other franchisees knew about this? Yes. And what was that evidence? Well, there are... Mr. O'Hare is a ringleader with five other franchisees who have filed a demand for arbitration and followed his lead in attempting to do the very same thing that he did. And this is a message to them that they are not allowed to do that. So this evidence of these five other franchisees was brought to the attention of the district court and impressed by you at the preliminary injunction hearing? Or is this post-hoc, that this has happened? Well, I think that this is my underlying rationale for taking the actions that we did on behalf of core progression. We did not argue this specific point before the court, but it's clear from the court's assessment of the situation that this is what was a concern that was presented in this case. Right. What I'm worried about is a disconnect between the harm you allege and the evidence you put forth that actually supported the harm. May I just get a drink, Your Honor? We put forth evidence that this franchisee had gone rogue while a and was ruining the brand by telling consumers that it was a fake franchise and that sort of thing. But when we talk about the infringement, I think it's important that the district court judge entered the preliminary injunction following the one day hearing on March 26, 2021. And even after the injunction was entered, they continued to infringe the trademark rights of core progression. And on June 23rd, 2021, the very same district court judge sanctioned them for violating the injunction. This is something that needed to be stopped. And Judge Carson, I think that it is fair to say, I'm very familiar with the transcript. I think it's fair to say that we may not have explicitly used terms to suggest the impact on other franchisees, but we clearly made the argument in the district court below that this is something that was going to harm the entire system. And what they were doing was so bad that they were making this franchise system look like it was a fraudulent enterprise. And that's a message that I don't think it's hard to It seems like some of the authority, and I'm not unsympathetic to your position, but it seems to me that some of the authorities suggest that a situation like yours might not be one of those where this just, we can just presume that this is going to permeate throughout the country, where you have a very regional franchise presence and then a very remote franchisee goes rogue on you, for lack of a better term. It seems to me that there has to be a little more connecting of the dots in that situation than if you had 50 locations in Metro Denver and one of the Denver centers did it. Well, let me give you an example of the evidence that was presented to the court to show that this is not just an isolated franchisee in North Carolina. We presented evidence during the hearing that Mr. O'Hare was working with another franchisee by the name of Meade and another franchisee whose name escapes me at the moment, and all three of them entered into a contract with a web designer who simply copied the core progression website. And so there are two others in the record who are essentially doing the same thing that O'Hare is doing in other parts of the country, hijacking this brand and making a surreptitious exit while they were franchisees after they downloaded the entire system and exported it to their own device so that when they were terminated after failing to pay their royalties, they would take this program and let it run, not just in North Carolina, but also here in Denver. And there is evidence to show that this is a concerted activity that, in point of fact, needs to be addressed because the others are going in the same direction. Thank you, counsel. I appreciate your argument. Thank you, Your Honor. I had a chance to look at the transcript while counsel was answering your questions. To clarify a couple of things, the other franchisees were never mentioned in this transcript. Mitchell Meade's name was never mentioned. The only time that Meade came up was in the context of the fictitious name Chris O'Meade, which had nothing to do with him. The reference to the block quote from Mr. Cerf says nothing about impact on franchisees. In this case, there was no presentation to the district court that this was in any way a conspiracy among other franchisees. This was something that was completely out of the record. And the fact is, when the justification for an injunction is that it's going to send a message to other franchisees if this is allowed to be disregarded, that's a presumption if there's no evidence presented to the district court to actually show that in this particular case there was a justification for that. That's inappropriate. Mr. Cerf's block quote that the court placed great reliance on says nothing about future harm, as we pointed out. It is overturned the same district court's grant of injunction in 2021. It looked very carefully at the conclusory assertions of the principle in that case, looking for things like imminence and actual harm, which were not there. The fact is that all the things we're talking about are past harm. When you get down to it, there's no indication in this case that the district court actually applied the heightened standard that it recognized was necessary in this case. Issuing two pages' worth of irreparable harm analysis, most of which is comprised of quotes from other cases, certainly doesn't meet the well-established precedent of this circuit and the Supreme Court, which demand far more than this. The extraordinary relief that was granted in this case must be reversed. Thank you, counsel. You are excused.